UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
POWER AUTHORITY OF THE STATE OF
NEW YORK,

            Plaintiff,

    -against-

The Tug M/V ELLEN S. BOUCHARD, and the
Barge B. NO. 280, their engines, apparel, tackle,
Boats, appurtenances, etc. *in rem*, and
BOUCHARD TRANSPORTATION CO., INC.,
MOTOR TUG ELLEN S. BOUCHARD, INC.
AND B. NO. 280 CORP, *in personam*,

            Defendants.
------------------------------------------------------------X

14 Civ. 4462 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

On January 6, 2014, Captain Daniel Yates was navigating the Motor Tug Ellen S. Bouchard (the "Tug") and Barge B. No. 280 (the "Barge"), owned by Bouchard Transportation Co., Inc., and B. No. 280 Corp (collectively, "Bouchard" or "Defendant"), in Long Island Sound. He decided to anchor in Hempstead Harbor, but Yates misread the navigation chart and negligently ordered the Barge to drop its 6,000-pound anchor in a cable area clearly shown in the chart.[1] It is alleged that the drop of the Barge's anchor caused a rupture in a submarine cable (the "Cable") which in turn caused dielectric fluid to leak into Long Island Sound.

The Power Authority of the State of New York ("NYPA"), the owner of the Cable, responded to the leak by promptly notifying local and federal regulatory authorities and deploying an environmental response team to halt the leaking, remove the fluid from the water, and take

---

[1] Yates later admitted that before he ordered the Barge to anchor on the morning of January 6, 2014, he misread the dotted lines in the navigational charts as indicating where the cables were, instead of the space in between them. Foley Ex. 13, Yates Tr. at 241.

measures to protect the surrounding environmental and coastal areas. The leaking of dielectric fluid, although significantly minimized by January 28, 2014, was not completely halted until February 27, 2014. NYPA bore all of the costs of this ongoing environmental response.

NYPA and Bouchard have various related proceedings before this Court. In this action, NYPA seeks spill response damages from Bouchard pursuant to the Oil Pollution Act, 33 U.S.C. §§ 2701 *et. seq.* ("OPA") and the New York Oil Spill Laws, N.Y. Nav. Law §§ 170 *et seq.* ("NYOSL"). Bouchard also seeks to limit its liability to the value of the Tug and Barge and pending freight in a related proceeding pursuant to the Limitation of Liability Act, 46 U.S.C. §§ 30505 and 30511 (the "Limitation Act"). *See* 14-cv-1262 (the "Limitation Proceeding"). Although the commencement of a suit filed under the Limitation Act usually stays or enjoins all related claims against the Limitation plaintiff, Bouchard and NYPA stipulated that NYPA could pursue its OPA and NYOSL claims in this separate proceeding, without prejudice to any potential defenses raised by Bouchard. *See* 14-cv-1262, Dkt. 48.

The parties now cross-move for summary judgment. Bouchard moves for summary judgment dismissing all claims asserted under OPA and directing NYPA to pursue its remaining spill response claims within the Limitation Proceeding. NYPA moves for declaratory relief that: (1) the liability provisions of the OPA apply to the subject discharge of oil; (2) NYPA has established a complete defense to liability pursuant to 33 U.S.C. § 2703(a); (3) Bouchard is the liable third party and is the responsible party under OPA with regard to the subject discharge of oil pursuant to 33 U.S.C. §2702(d); and (4) Bouchard is liable for all of NYPA's removal costs and damages, as defined by OPA and in an amount to be determined by the Court. Bouchard also moves in both this action and the Limitation Proceeding for partial summary judgment finding NYPA comparatively negligent under the spoliation doctrine for an alleged failure to accurately

2

measure the Cable depth.

For the reasons that follow, Bouchard's motion dismissing all claims under OPA and ordering NYPA to pursue its NYOSL claim in the Limitation Proceeding is GRANTED and NYPA's motion is DENIED. Because the Court dismisses NYPA's OPA claims and directs NYPA to pursue its NYOSL in the related Limitation Proceeding, Bouchard's spoliation motion as it relates to this action is DENIED as moot.

## BACKGROUND

The Court assumes familiarity with the details of the January 6, 2014 incident (the "Incident"), discussed at length in the order issued concurrently to this Order in the Limitation Proceeding (the "Limitation SJ Order"). The discussion here is limited to facts relevant to determining whether NYPA's environmental response costs are reimbursable by Bouchard under OPA.

### Environmental Regulation of the Y-49 Cable System

The Cable that ruptured on January 6, 2014 is part of an electrical transmission system (the "Y-49 Cable System") owned by NYPA and primarily utilized to provide electricity to Long Island. Venezia Ex. B6, Fishman Tr. at 12-13.[2] The Y-49 Cable System begins at a sub-station located in Sprain Brook, Westchester County, then runs through Westchester County by way of a buried pipe to a transition station located in the City of New Rochelle, where the transmission line becomes submerged cables, crosses Long Island Sound to a transition station in the Town of North Hempstead, Nassau County, and from there by way of a buried pipe through Nassau County to a

---

[2] Unless otherwise noted, citations to the motion and other documents refer to docket 14 Civ. 4462 (PAC). In this Order, the exhibits submitted in support of Bouchard's motion dismissing all claims asserted under OPA, (Dkt. 86), are labeled "Venezia Ex.," (Dkt. 87), and exhibits submitted by NYPA in opposition are labeled "Vincent Foley Ex." (Dkt. 104). Exhibits submitted in support of NYPA's motion for partial summary judgment, (Dkt. 92), are labeled "Foley Ex.," (Dkt. 94), exhibits submitted by Bouchard in opposition are labeled "Gina Venezia Ex.," (Dkt 108), and NYPA's Reply Exhibits are labeled "Foley Reply Ex." (Dkt. 114).

3

sub-station located in Garden City, Nassau County. Foley Ex. 1, Bouchard's Responses to Cable Interests' First Set of Requests to Admit, dated December 29, 2017 ("RFA"), Nos. 20 & 22.

The submarine portion of the Y-49 Cable System consists of four parallel, self-contained, dielectric fluid-filled, 345,000-volt electrical transmission cables (collectively, the "Submarine Cables"). Foley Ex. 1 - RFA, No. 20. The dielectric fluid in the Submarine Cables is a hydrocarbon, petroleum-based oil which acts as a coolant and lubricant to the electrical components of the Submarine Cables and is necessary to their operation. Foley Ex. 36 - Dosso, Tr. at 22; Foley Ex. 37 - Kahabka, Tr. at 16 -17; Foley Ex. 1 - RFA, No. 30. The total storage capacity of the four Submarine Cables is 10,000 gallons of dielectric fluid, 2500 gallons per cable. Venezia Ex. B3. The pressure of dielectric fluid in the Submarine Cables is maintained by land-based storage tanks with pumping stations (or pressurization plants) on either side of the submerged portion, each with a storage capacity of approximately 10,000 gallons. Foley Ex. 30 - Dasso Ex. I (NYPAY49-0055713). The storage tanks and pumping stations maintain positive pressure on the dielectric fluid at all times during operation of the Submarine Cables, including the Cable. *Id.*

The Environmental Protection Agency ("EPA") regulates NYPA's Submarine Cables as a "Non-Transportation Related Offshore Facility" and requires NYPA to maintain a Spill Protection Control and Countermeasure Plan ("SPCC") to plan for and respond to a leak. Venezia Ex. B2, Y-49 Submarine Cable SPCC Plan; 40 C.F.R. pt. 112.7; 40 C.F.R. pt. 112. Although NYPA's SPCC notes that the Submarine Cables form part of a larger electrical transmission system, NYPA's obligations under the SPCC are limited to responding to incidents that involve the four Submarine Cables. SPCC at 3. Notably, while the SPCC defines the "submarine portion" of the Y-49 Cable System as including both the Submarine Cables and the two land-based pressurization plants, it goes on to delegate responsibility for the land-based pressurization plants to other entities,

4

stating: "[T]he maintenance and monitoring of the [] pressurization plants is performed by Con Edison . . . and by [the Long Island Power Authority] . . . . Their procedures for training, maintenance, security, monitoring and spill response are discussed in their respective SPCC plans." *Id.* at 4.

NYPA's Environmental Response

At 7:02 a.m. on January 6, 2014, the Y-49 Cable System experienced an electrical fault in one of its four Submarine Cables. Foley Ex. 19 - Zuccarelli Tr. at 131-65. The nature of the alarm indicated a catastrophic fault, and NYPA's engineers understood the alarm to mean that dielectric fluid was leaking from the Cable into the water. *Id.* at 50-53. NYPA responded by notifying the United States Coast Guard and the New York Department of Environmental Conservation of the spill and commencing steps to implement its SPCC. Foley Ex. 39 - Kahabka, Tr. at 32 - 34; Foley Ex. 2 - Schwabe, Tr. at 93 - 95; Foley Ex. 40 - Gomez, Tr. at 15. On January 8, 2014, the United States Coast Guard also visited the Tug and issued Bouchard a "Notice of Federal Interest for an Oil Pollution Incident" informing Bouchard that under OPA, it may be liable for removal costs and damages associated with the spill. Foley Ex. 53 - Yates 30.

NYPA ultimately notified its environmental response contractor, Miller Environmental Group ("Miller"), and Miller mobilized personnel, divers, equipment, and materials to protect the environment and coastal areas from the incursion of oil, remove the discharged oil from the water, and locate and secure the source of the discharge. Foley Ex. 33 - Kahabka, Tr, pp. 22-34.; Foley Ex. 25 - Schwabe Ex. 10. The Cable was ultimately located on January 16, 2014. Foley Ex. 25 - Schwabe Ex. 10 (NYP A Y 49-0007812); Foley Ex. 46 - Michalski Tr.at 67; Foley Ex. 47 - Michalski Ex. 18.). From January 16th through the 25th, the divers followed the Cable north and south looking for the fault/rupture location, which they found on January 25, 2014. Foley Ex. 25 -

5

Schwabe Ex. 10 (NYPA49 —0007812-16); Foley Ex. 46 - Michalski, Tr, pp. 102.

Upon locating the rupture point, NYPA and Miller decided that to completely secure the leak, the Cable had to be "cut and capped" - a process that involved raising the Cable to the surface and cutting out a section including the rupture point and then capping the two severed ends. Foley Ex. 51 - Collins Tr. p. 75; Foley Ex. 52 - Pease Tr. p. 34. In the interim, the Cable was clamped, and an oil collection drum was placed over the clamp to partially contain the fluid that was still leaking from the Cable. Foley Ex. 25 - Schwabe Ex. 10 (NYPAY49-0007814) (1/28/14 first entry). After the clamp proved less effective than hoped, a containment device was also installed which helped to further minimize the leaking. Foley Ex. 25 - Schwabe Ex. 10 (NYPA Y 49-0007814) (1/28/14 second entry). The cut and cap operation was finally completed on February 27, 2014, at which point the environmental response was demobilized. Foley Ex. 25 - Schwabe Ex. 10 (NYP A Y 49-0007820).

In total, NYPA was invoiced and paid $9,848,087.12, chiefly to Miller but also to other entities. Foley Ex. 29. NYPA alleges that all of these costs are attributable to the environmental response, which includes the costs for clean-up, removal, protecting the coast line from the oil, and securing the leak of dielectric fluid from the Cable by cutting and capping the damaged cable. *See* NYPA Mem. in Support at 9.

## DISCUSSION

### I. Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the burden of demonstrating the absence of any genuine dispute of material facts.

6

*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## II. The Oil Pollution Act

OPA creates a comprehensive compensation and liability scheme that imposes strict liability for "removal costs" and "damages" on the "responsible party" of a "vessel" or "facility" from which oil is discharged into navigable waters. 33 U.S.C. § 2702(a). Notwithstanding this strict liability, a responsible party is entitled to a complete defense if it can establish that the discharge of oil was caused solely by the act or omission of a third party. 33 U.S.C. § 2703(a). Where a complete defense is established, the third party is treated as the responsible party and OPA provides the original responsible party with a direct strict liability claim against that third party for removal costs incurred by the original responsible party. § 2702(d)(1)(B). OPA has also been construed as preempting the Limitation Act. *See* 33 U.S.C. § 2702(a); *Complaint of Metlife Capital Corp.*, 132 F.3d 818, 822 (1st Cir. 1997). Thus here, if NYPA's claims are rightly brought under OPA, NYPA can pursue these claims to resolution notwithstanding the stay order entered by this Court in the Limitation Proceeding. *See* 14-cv-1262 (PAC), Dkt. 3.

OPA, however, applies only to discharges or threatened discharges of "oil" from a "vessel

7

or facility." Bouchard argues that the Cable does not meet OPA's statutory definition of a "facility," and thus, OPA cannot apply. The Court agrees.

## A. OPA's Statutory Definition of Facility

Courts have held that OPA is to be construed broadly given its remedial purpose. *See, e.g., Smith Prop. Holdings v. U.S.*, 311 F. Supp. 2d 69 (D.D.C. 2004); *U.S. v. Boais D'Arc Operating Corp.*, 1999 U.S. Dist. LEXIS 3199 (E.D. La. 1999). Beyond this general guidance, "[b]ecause OPA litigants usually agree as to what constitutes the facility for a particular case, there is virtually no applicable case law elaborating on this definition." *US. v. Viking Resources, Inc.*, 607 F. Supp. 2d 808, 816 n.24 (S.D. Tex. 2009) (internal citations omitted). The parties collectively identify three cases that address OPA's definition of facility at all, all of which do so largely in dicta, and none of which are controlling on this Court. *See Smith Prop. Holdings, 4411 Conn. LLC v. United States*, 311 F.Supp.2d 69 (D.D.C. 2004); *US. v. S. Pac. Transp. Co.*, No. 94-6176-HO, 1995 U.S. Dist. LEXIS 5247 (D. Or. Feb. 20, 1995); *Sekco Energy v. M/V Margaret Chouset*, 820 F. Supp. 1008 (E.D. La. 1993).

The EPA, the relevant regulatory body charged with implementing OPA and related water pollution statutes, also provides little guidance on this interpretive question. While the EPA regulates NYPA's Submarine Cables as an "Offshore Facility" pursuant to 40 C.F.R. 112, the definition of facility under that regulation is significantly broader than its definition under OPA. Under 40 C.F.R. 112, "facility" encompasses any "structure . . . used in oil well drilling operations, oil production, oil refining, oil storage, oil gathering, oil processing, oil transfer, oil distribution, and oil waste treatment, *or in which oil is used.*" 40 C.F.R. § 112.2 (emphasis added). Indeed, and as will be discussed further below, the EPA issued 40 C.F.R. § 112 pursuant to its authority under the Clean Water Act, 33 U.S.C. § 1251 *et seq.* ("CWA"), a statute enacted prior to OPA which

does not define facility at all. Thus, the EPA's classification of the Submarine Cables as an Offshore Facility for purposes of maintaining a SPCC does not control whether those Cables constitute a "facility" under OPA.

Absent controlling precedent or persuasive regulatory guidance, the Court begins the task of statutory interpretation with the text. *Gottlieb v. Carnival Corp.*, 436 F.3d 335, 337 (2d Cir.2006); *Baker v. Johnson*, 109 F. Supp. 3d 571, 576 (S.D.N.Y. 2015). Where the language is clear, the court's "only role is to enforce that language according to its terms." *Baker*, 109 F. Supp. 3d at 576 (internal quotation omitted). Only where there is ambiguity, should a court go on to consider legislative history to ascertain congressional intent. *Scott v. City of New York*, 592 F. Supp. 2d 386, 398 (S.D.N.Y. 2008).

OPA defines "facility" as:

> any structure, group of structures, equipment or device (other than a vessel) which is used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil. This term includes any motor vehicle, rolling stock, or pipeline used for one of more of these purposes.

*Id.* § 2701(9). As NYPA concedes, the primary purpose of the Y-49 Cable System is to transmit electricity, not to "store," "handle" or to "transfer" oil.[3] NYPA Mem.in Support at 14. Nonetheless, the statutory language clearly contemplates that a facility can be used for "one or more" purposes, § 2701(9), and NYPA contends that at least one of the purposes of the Cable is to store, handle or transfer oil.

As an initial matter, the Court must determine whether the relevant facility here is limited to the Submarine Cables or should instead be construed as including the entire Y-49 Cable System.

---

[3] For purposes of its motion, Bouchard assumed without conceding that the dielectric fluid here meets OPA's statutory definition of "oil." *See* Bouchard Mem. at 1, n. 2. Since the Court finds resolving this issue unnecessary to its ultimate holding, the Court similarly assumes without deciding that the dielectric fluid meets OPA's statutory definition of "oil."

9

NYPA would have the Court adopt the latter view and contends that because the storage tanks on either side of the Submarine Cables clearly "store" oil, the Y-49 Cable System meets OPA's definition of facility. But such a reading is inconsistent with the language of OPA, which distinguishes between "onshore facilities" and "offshore facilities" for purposes of determining the responsible party, *see* 33 U.S.C. § 2701(22) & (24), and the EPA's own regulation of the Y-49 Cable System, which holds different entities responsible for the Y-49 Cable System's submarine and land-based components. *See* SPCC at 4. Indeed, NYPA's report to the EPA following the Incident describes the spill as emanating not from the Y-49 Cable System, but from the "Y-49 Submarine Cable." Venezia Ex. 3, NYPA49-0008071-75.

Narrowing focus to the four Submarine Cables, it is clear that these Cables are not used for any of the enumerated purposes outlined in OPA's definition of facility. NYPA argues that because the Submarine Cables need dielectric fluid as an insulant to operate, the Cables were necessarily built to store, handle and/or transfer oil. But this analysis confuses the inquiry. While it is clear that the Submarine Cables can and do, to some extent, store, transfer, or handle oil, they are not *used* for that purpose, as the text requires. NYPA's interpretation would essentially read out the entire phrase "used for one or more of the following purposes," a phrase which the statute's drafters clearly thought important, as it is repeated twice within OPA's two-sentence definition of "facility." NYPA's reading stretches the definition of facility too far and is inconsistent with the plain meaning of its text. The Submarine Cables do not meet OPA's definition of facility.

### B. Legislative History of OPA and the CWA

The Court's plain language reading is further supported by the legislative history of OPA and a comparison of OPA to the CWA. OPA was enacted after the Exxon Valdez oil spill in Prince William Sound, Alaska. *Rice v. Harken Expl.*, 89 F. Supp. 2d 820, 822 (N.D. Tex. 1999).

10

Recognizing that existing laws "required large taxpayer subsidies for costly cleanup activities, allowed third-party damages to go uncompensated, and presented substantial barriers to victims' recoveries," *id.*, Congress enacted OPA as a remedial scheme that would "compensate any party suffering damages from discharges of oil or hazardous substances . . . [,] provide protection for the environment and [] aid the victims of oil spills." *Id.* (*citing* S. Rep. No. 94, 101st Cong., 1st Sess. (1989), *reprinted in* 1990 U.S.C.C.A.N. 722).

OPA was not the first federal statute to address water pollution in the United States. Nearly two decades earlier, Congress enacted the CWA, which established the modern regulatory scheme for water pollution. *See generally S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102 (2004). The CWA is broader than OPA in many ways. For instance, while OPA is limited to discharges of oil, the CWA applies to discharges of "hazardous substances," including but not limited to oil. 33 U.S.C.A. § 1321(a)(14). Still, OPA was drafted with the CWA in mind, intentionally copying its definitions of "onshore" and "offshore" facilities verbatim.[4] Unlike OPA however, CWA does not include a separate definition of facility. *Compare* 33 U.S.C. § 1321(a) (CWA) *with* 33 U.S.C. § 2701 (OPA). That Congress copied some provisions of the CWA exactly, but went on to include an additional definition of "facility" implies that this added language means something. *See Novella v. Westchester Cty.*, 661 F.3d 128, 142 (2d Cir. 2011) (discussing "the presumption of consistent usage and meaningful variation" in statutory interpretation). The meaning of onshore and offshore facilities under OPA are limited by OPA's "facility" definition; those of CWA are not.

---

[4] *See* H.R. REP. No. 101-653, at 2 (1990) ("Conf. Rep."), *reprinted in* 1990 U.S.C.C.A.N.779, 779-80 ("The terms 'offshore facility' . . . are re-stated verbatim from section 311(a) [of the CWA] . . . In each case, these [CWA] definitions shall have the same meaning in this legislation as they do under the [CWA] and shall be interpreted accordingly."); *see also In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 844 F. Supp. 2d 746, 760 n. 29 (E.D. La. 2012) ("[W]hat is an offshore facility under the CWA is an offshore facility under OPA, and *vice versa*.").

11

OPA's narrower application is further supported by statements from the legislative history which reveal that when Congress enacted OPA, it was focused on petroleum oil and the risks associated with its exploration and transport, not with the leaking of hazardous substances more generally. *See* S. Rep. No. 94, 101st Cong., 1st Sess. (1989), *reprinted in* 1990 U.S.C.C.A.N. 722 ("The Nation's continued heavy dependence on oil results in increasing transport of oil in tankers through U.S. waters and greater offshore exploration and production in deeper waters and harsher environments. These conditions can only increase the potential for future catastrophic spills and the need to prevent such pollution and minimize its damage."); Conf. Report at 17 (OPA "will significantly reduce the likelihood of an oil spill by establishing tough standards for those who operate tankers."). Assessing this legislative history, courts have similarly concluded that OPA is designed "to address the nationwide and pernicious threat to coastal waters posed by unnecessary pollution resulting from *oil exploration* activities." *Avitts v. Amoco Prod. Co.*, 840 F. Supp. 1116, 1122 (S.D. Tex. 1994), *rev'd on other grounds*, 53 F.3d 690 (5th Cir. 1995) (emphasis added).

Accordingly, because the Cable does not qualify as a facility under OPA, Bouchard's motion for summary judgment dismissing NYPA's claims under OPA is GRANTED. It follows that NYPA's cross-motion seeking declarations and determinations as to Bouchard's third-party liability under OPA must be DENIED. The Court turns now to the remaining issue; NYPA's NYOSL claim.

### C. OPA's Savings Provision and the NYOSL

Given that NYPA's claim is not properly brought under OPA, the Court must go on to determine whether NYPA can nonetheless rely on OPA's savings provision, *see* 33 U.S.C.A. § 2718, to pursue its NYOSL claim outside of the Limitation Proceeding. As already stated, a vessel owner's filing of an action under the Limitation Act stays or enjoins all claims "arising from any

embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture," § 30505 (b). Consistent with the Supremacy Clause, the Limitation Act indisputably encompasses NYPA's NYOSL claim, *see In re Oswego Barge Corp.*, 439 F. Supp. 312 (N.D.N.Y. 1977), unless an exception applies.

NYPA maintains that OPA's savings provision clause provides such an exception. OPA's savings clause states:

> Nothing in this Act or the [Limitation Act] shall--
> (1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to--
>
>> (A) the discharge of oil or other pollution by oil within such State; or
>> (B) any removal activities in connection with such a discharge; or
>
> (2) affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under the Solid Waste Disposal Act (42 U.S.C. 6901 *et seq.*) or State law, including common law.

33 U.S.C. § 2718. Courts have construed this savings provision as an express preemption of the Limitation Act for state oil spill claims that fall within its purview. *See, e.g., United States v. Locke, 529 U.S. 89, 104 (2000); Matter of Complaint of Supreme Towing Co., Inc.*, No. CV 07-9231, 2010 WL 11561150, at *15 (E.D. La. Aug. 12, 2010). The Court must determine here whether NYPA's NYOSL claim constitutes such a claim.

Read in isolation, OPA's savings provision would seem to support NYPA's position that even if OPA does not apply to the Incident, § 2718 still repeals the Limitation Act for state causes of action that relate to "the discharge of oil or other pollution by oil within such State." *Id.* NYPA rightfully points out that by including this provision, OPA's drafters clearly intended that OPA would provide the floor, not the ceiling, on the potential scope of liability imposed on the liable

13

actors whose conduct falls within its purview—states are free to add-on. *See* NYPA Mem. in Support at 19.[5] But the issue here is of a different nature. Bouchard does not argue that states cannot impose additional regulations and forms of liability on OPA's responsible parties. Instead, Bouchard argues that OPA's savings provision cannot preempt the Limitation Act for conduct that itself does not fall under OPA. The Court agrees.

In *United States v. Locke*, 529 U.S. 89, 104 (2000), the Supreme Court considered the scope of OPA's savings clause in deciding whether a Washington state law which regulated the training, general navigation, and watch procedures of tanker vessels was preempted. In striking down the regulation notwithstanding OPA's savings clause, the Supreme Court observed:

> Placement of the saving clauses in Title I of OPA suggests that Congress intended to preserve state laws *of a scope similar to the matters contained in Title I of OPA*, not all state laws similar to the matters covered by the whole of OPA or to the whole subject of maritime oil transport.

*Id.* at 105 (emphasis added). After concluding that OPA's preemptive effect had limits, the Supreme Court also emphasized the importance of maintaining balance between state and federal regulation of maritime activity, stating, "[w]e decline to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law." *Id.* at 106.

While lower courts have not squarely addressed this issue, courts considering either OPA's savings clause provision or its relationship to the Limitation Act generally, pursuant to 33 U.S.C. § 2702, have similarly concluded that OPA's preemption does not exceed the scope of relief available under OPA. *See Matter of Complaint of Supreme Towing Co., Inc.*, No. CV 07-9231, 2010 WL 11561150, at *15 (E.D. La. Aug. 12, 2010) ("The scope of OPA preemption, as has been recognized repeatedly by federal courts, is limited to damages that are actually available under the

---

[5] *See also* S. REP. NO. 101-94, at 6 (1989) *reprinted in* 1990 U.S.C.C.A.N 722, 728 ("The theory . . . is that the Federal statute is designed to provide basic protection for the environment and victims damaged by spills of oil. Any state wishing to impose a greater degree of protection for its own resources and citizens may do so.").

OPA"); *see also In re DEEPWATER HORIZON*, 745 F.3d 157, 173 (5th Cir. 2014) ("The savings provision does not apply beyond the OPA itself and two other laws.").

Consistent with this guidance, the Court finds that permitting NYPA to proceed with its NYOSL claim outside of the Limitation Act here would be inconsistent with OPA's statutory scheme, and risks disrupting the exact "federal-state balance," *Locke*, 529 U.S. at 106, the Supreme Court has instructed courts to preserve. As Bouchard notes, the CWA also has a savings provision, *see* 33 U.S.C. §1321(o)(2), but its provision does not preempt the Limitation Act. *See In re Oswego Barge Corp.*, 439 F. Supp. 312 (N.D.N.Y. 1977) *aff'd on other grounds*, 664 F.2d 327 (2d Cir. 1981). Congress made amendments to the CWA in enacting OPA but failed to expand the CWA's savings provision; the Court declines to read OPA in a way that would do so now. *See In re DEEPWATER HORIZON*, 745 F.3d at 173 ("Courts cannot, without any textual warrant, expand the operation of Section 2718(c) [of OPA] to, in effect, modify the scope of preemption under the CWA.").

In sum, because NYPA's OPA claims do not apply to the spilling of dielectric fluid at issue here, OPA also does not preempt NYPA's NYOSL claim arising from the same Incident. Accordingly, NYPA must withdraw its NYOSL claim from this action and pursue it in the related Limitation Proceeding, 14-cv-1262 (PAC).

### III. Spoliation

Bouchard also moves in this action and the related Limitation Proceeding for partial summary judgment finding NYPA comparatively negligent for the Incident based on an alleged failure to preserve a measurement of the Cable Depth. Because the Court's dismissal of NYPA's OPA claims precludes further discussion of liability in this action, this motion is DENIED as moot as it relates to this action.

## CONCLUSION

For the reasons stated above, Bouchard's motion dismissing all claims under OPA and ordering NYPA to pursue its NYOSL claim in the Limitation Proceeding is GRANTED and NYPA's motion is DENIED. Bouchard's spoliation motion is DENIED as moot.

The Clerk of the Court is instructed to close the motions at Dkts. 86, 89, and 92 and close this case.

Dated: New York, New York
      March 27, 2019

SO ORDERED

*[signature]*
PAUL A. CROTTY
United States District Judge